UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO. 07-40

PAUL DUGLE, *by and through his legal guardian
Megan Dugle,* and MEGAN DUGLE, *in her
individual capacity,*                                                                                                                                                                                         PLAINTIFFS,

KENTUCKY ASSOCIATION OF COUNTIES
WORKERS COMPENSATION FUND,                         INTERVENOR PLAINTIFF,

v.                                  **OPINION AND ORDER**

NORFOLK SOUTHERN RAILWAY COMPANY,                         DEFENDANT.

\* \* \* \* \* \* \* \* \*

This matter is before the Court on the Motions for Reconsideration filed by the Defendant Norfolk Southern Railway Company ("Norfolk")(DE 294) and by the Plaintiffs (DE 336).

**I.    NORFOLK's MOTION.**

Norfolk asks this Court to reconsider its ruling denying Norfolk summary judgment on the Plaintiffs' negligence claim against it.

The pertinent facts were recited by this Court in its prior summary judgment ruling (DE 286). No party has disputed any of those factual findings, and the Court will not belabor them in this opinion. Suffice it to say that, on September 1, 2006, Paul Dugle, who was a Shelby County Deputy Sheriff at the time, was driving a 2006 Crown Victoria police cruiser across a railroad crossing in Shelby County when a train owned by Norfolk hit the cruiser, leaving him permanently impaired. (DE 1, State Court Complaint; DE 176, Ex. 1, KSP Report). The Plaintiffs assert a negligence claim against Norfolk.

The Court has determined that the crossing at issue was a private crossing. It is important to

note from the outset that railroads have very limited duties at private crossings compared to public crossings. In fact, a railroad's duty at a private crossing has been described as "practically non-existent."*Gaw v. CSX Transportation, Inc.*, 2008 WL 793655 (W.D. Ky. 2008), *aff'd*, 326 Fed Appx. 382 (6th Cir. 2009). Most relevant to this case, a railroad has no duty to sound the horn at a private crossing, and there is no dispute that Norfolk did not do so when approaching this crossing prior to the accident.

But, in certain situations, a railroad's duties at a private crossing are more than "non-existent." This is true for private crossings that are also "ultrahazardous." An "ultrahazardous" crossing is one that is:

> so exceptionally dangerous on account of a natural or habitual artificial obstruction, or of other immediate surroundings, that a jury could say that one exercising ordinary care and prudence in traveling the highway can not see an oncoming train or become aware of its near approach until he is practically in immediate danger and unable by the exercise of ordinary care to avoid being struck by the train.

*Calhoun v. CSX Transp., Inc.*, 2009 WL 152970 at *7 (Ky. App. 2009) (quoting *Cincinnati, N.O. & T.P. Ry. Co. v. Hare's Adm'x*, 178 S.W.2d 835, 837 (Ky.1944), overruled on other grounds, *Louisville & N.R. Co. v. Fisher*, 357 S.W.2d 683 (Ky. 1962)).

In *Wright v. Illinois Cent. Gulf R. Co.*, 550 S.W.2d 489 (Ky. 1977), the Kentucky Supreme Court defined an "extra-hazardous crossing" as one that "obscures the view of the traveling public approaching a crossing. This may consist of cuts, embankments, vegetation or other obstacles that obstruct the view of the traveling public in close proximity to the crossing." *Id*. at 491. In *Hargadon v. Louisville & N.R. Co.*, 375 S.W.2d 834 (Ky. 1964), the Kentucky Supreme Court held that the extra-hazardous doctrine does not apply "unless there is a real and substantial obstruction to sight and hearing." *Id.* at 838. In *Jewell v. CSX Transp., Inc.*, 135 F.3d 361 (6th Cir. 1998), the Sixth Circuit

2

held that the test for an extra-hazardous crossing "requires an actual physical inability to see or hear, and not merely such human factors as a disinclination to look for a train due to the angle of the intersection, distractions or diversions." *Id*. at 364.

At such crossings, if the railroad company knew or by the exercise of ordinary care should have known the crossing was ultrahazardous, "then it was the duty of the company and its employees to use such precautions to warn and avoid injury to travelers at the crossing as in the exercise of ordinary care an ordinarily prudent person operation a railroad would consider necessary under similar circumstances." Palmore Kentucky Instructions to Juries, Vol. II § 25.06 (emphasis added).

It is clear from the case law that the duty of a railroad at an extrahazardous crossing is limited to the duty to *warn* travelers of the crossing's existence. *See, e.g., Louisville & Nashville Railroad Co. v. Quisenberry*, 338 S.W.2d 409, 411 (Ky. 1960) (where crossing is unusually dangerous, reasonable care may require that an alarm or signal be given by the approaching train); *Jewell v. CSX Transportation, Inc.*, 135 F.3d 361, 363 (6th Cir. 1998) (rationale of the ultrahazardous crossing doctrine is that there are some circumstances requiring greater warning of the approach of the train than is usual or statutorily required).

Of course, the driver also has some duties at railroad crossings. Under Kentucky common law, drivers have a duty to yield to an approaching train at every crossing. *Illinois Central Railroad Co. v. Arms*, 361 S.W.2d 506, 509 (Ky. 1962) ("trains have the right of way and all persons on the street or highway shall yield precedence to the trains"). Moreover, at an extrahazardous crossing, a driver has a heightened duty of care. "[A]n obstruction constitutes a warning that more rather than less care must be exercised." *Louisville & N.R.R. v. Fisher*, 357 S.W.2d 683, 687 (Ky. 1962).

In this case, the parties have largely defined the duty to yield in accordance with the Kentucky yield sign statute which provides that a driver approaching a yield sign must slow down to a reasonable speed and, "if required for safety. . .stop at a clearly marked stop line but, if none, . . ., then at the point nearest the intersecting roadway where the operator has a view of approaching traffic on the intersecting roadway before entering it." KRS 189.330(5). Even absent the yield sign statute, the Court would certainly instruct the jury that a duty to yield includes the duty to slow down to a reasonable speed and to stop if required for safety where the driver has a view of the approaching train. This is something that drivers do daily as a matter of course when approaching a yield sign.

Making these determinations – whether a crossing is ultrahazardous and whether the railroad and driver complied with their duties at such a crossing – seems to involve multiple factual inquiries that are generally the duty of the jury and not the courts to make. In its prior opinion, the Court found that the Plaintiffs had presented sufficient evidence to permit a jury to find that the crossing was ultrahazardous and that the collision could at least partly be attributed to Norfolk's failure to take sufficient precautions to warn travelers at the crossing of an approaching train.

The Court has, however, been troubled by that decision in light of the relevant Kentucky case law. In, by far, the majority of cases, the courts find that the railroads are entitled to judgment as a matter of law. In reaching that decision, however, the Kentucky courts appear to have made factual determinations. Further complicating matters is the fact that the case law regarding negligence claims at ultrahazardous crossings was created when Kentucky still followed the doctrine of contributory negligence. However, at oral argument on these motions, both parties agreed that this was of no import to this Court's analysis.

It could well be that the Kentucky Supreme Court's forthcoming decision in *Calhoun* will

4

shed additional light on this issue. However, both parties in this case declined the Court's invitation to stay this case until after *Calhoun* is resolved. Thus, on reconsideration, the Court has reviewed the current state of Kentucky law in cases involving a negligence claim against a railroad at an alleged ultrahazardous private crossing and has attempted to read the cases in harmony.

What the Court has found is that, in the two cases where the courts have permitted the jury to determine whether a private crossing is ultrahazardous, there has been no visual aid to the driver at all to warn him of the possibility of an approaching train. *See Louisville & N.R. Co. v. Quisenberry*, 338 S.W.2d 409 (Ky. 1960) and *Louisville & Nashville R. Co. v. Bodine*, 59 S.W. 740 (1900)**.** In fact, *Quisenberry* specifically states that the issue before it was whether, at a highly dangerous crossing at which neither the train engineer nor the decedent "had enough time to do anything to prevent the accident after they came within view of each other," and "*when visual aids are unavailable*, it is proper to submit to the jury the question of whether the engineer should have warned of the train's approach by proper signals." 338 S.W.2d at 410-11 (emphasis added). *Quisenberry* answered that precise question in the affirmative.

In this case, however, there can be no dispute that there *is* a visual aid alerting drivers to the possibility of an oncoming train. That visual aid was a crossbuck which was located approximately 16 feet from the rail nearest Dugle's cruiser. There is no dispute that the crossbuck was unobstructed and visible on Dugle's approach to the crossing.

Given the multitude of facts regarding sight distances, road curvatures, and topographies set forth in the relevant cases and the discussions of those issues and perception-reaction time in this case, the legal significance of a visual warning such as a crossbuck is easily overlooked. However, the presence or absence of a visual warning must be considered and, importantly, it must be

5

considered in determining whether the crossing is ultrahazardous.

It is worth repeating, the railroad generally owes almost no duties at a private crossing at all. Thus, visual warnings are not generally required and are not located at every private crossing. At this private crossing, however, there is a visible crossbuck warning travelers that a railroad crossing lies ahead. The question then is whether, even with an unobstructed visual warning to drivers that trains may be approaching, the private crossing presents such a hazard that some *additional* warning to travelers that trains may be approaching, such as a sounding of the horn, may be required.

Of course, the simple existence of a crossbuck does not necessarily mean a crossing is not ultrahazardous. If, despite its existence, it would be impossible for a driver to see an approaching train in time to avoid the accident, then the crossing may still be considered ultrahazardous and some audible warning of the train's approach may well be required.

Here, however, there is no dispute that, if Deputy Dugle had stopped his cruiser with the front of it near the crossbuck, he could have seen west for more than 400 feet. (DE 176, Ex. 1, Ky. State Police Report). Given that there was a visual warning that a train may be approaching and that it was located at a spot where a driver could see more than 400 feet, no reasonable juror could find that the crossing was so exceptionally dangerous that Deputy Dugle, exercising ordinary care, could not have seen the oncoming train at this crossing or become aware of the train's near approach until he was practically in immediate danger and unable by the exercise of ordinary care to avoid being hit by it.

*Calhoun* hints that, where there is a sight distance of 300 feet or less, even where there is a crossbuck, the issue of whether the crossing is ultrahazardous should go the jury. *Calhoun*, 2009 WL 152970 at * 8 (citing *Quisenberry*'s determination that a sight line of 300 feet creates a jury question on whether the crossing is ultrahazardous). The sight distance here is at least 400 feet. In

determining whether that fact either requires this matter to be submitted to a jury or prohibits it, the Court notes that the language at issue in *Calhoun* is dicta at best. Further, there are no factual findings in *Calhoun* or any other case that would justify a legal determination that a sight distance of 300 feet or less could always be interpreted as inadequate or that a sight distance of any certain amount is always adequate. There is simply no bright line rule about what sight distance renders a crossing ultrahazardous.

Instead, the focus is on whether the view of the traveling public in close proximity to the crossing is obscured to such an extent that there is an actual physical inability to see or hear the approaching train. *Jewell*, 135 F.3d at 364. In other words, the question is whether Dugle could have seen the approaching train in time to avoid the accident. Clearly, had he stopped at the crossbuck, he could have.

The Court recognizes there is no absolute duty to stop at a crossbuck in Kentucky. Rather, a driver only has to stop if that is what is required for safety. But, at this particular crossing, there is no dispute that the crossbuck was visible to Paul Dugle warning him of a railroad crossing. Plaintiffs argue that, on his approach to the crossing, Dugle's view to the west was obscured to such an extent that he could not possibly see the train until he was 30 feet away from the north rail of the tracks.

In such a situation, where Deputy Dugle knew through a visual warning that a train may be approaching and also knew that he did not have sufficient vision on approach to the crossing, the only reasonable action for Deputy Dugle to take was to approach the crossing prepared to stop. Had he done so, he would have had a clear view of the train approaching to the west.

The Court also recognizes that Deputy Dugle was driving at a speed of 8.5 miles per hour

when he first saw the train and that there is expert testimony that, at that point, he could not have stopped in time to avoid the collision. However, on reconsideration, the Court finds that the relevant visual stimulus in determining whether this crossing is ultrahazardous is not the train but the crossbuck. There is no allegation that Deputy Dugle would have been unable to stop before the crossing after the crossbuck became visible to him. Further, as Norfolk points out on reconsideration, drivers are charged with driving at a rate of speed that permits stopping after viewing a sign that requires yielding. This is true of every yield sign. It is also true of every crossbuck which announces the possibility of the approach of a train to which the driver must yield.

For these reasons, on reconsideration, the Court amends its Summary Judgment ruling to find that the crossing at issue in this case is not ultrahazardous. Accordingly, Norfolk was not required to take any further precautions to warn travelers of a train's approach than already existed at the crossing, and the Plaintiffs' negligence claim against Norfolk must be dismissed.

The Court notes that the outcome of this case would be no different if the Court were to assume that, without considering the existence of the crossbuck, the crossing was ultrahazardous. Norfolk then would have a duty to provide some warning to travelers of the possibility of an approaching train. However, there *is* a visual warning of a train's approach at this crossing. The crossbuck warns drivers that they should approach the crossing prepared to stop for an oncoming train if necessary. If Deputy Dugle's view to the west was obstructed as Plaintiffs assert, then it was even more incumbent upon him to approach the crossing prepared to stop. Even assuming that the crossing is ultrahazardous, Norfolk was under no duty to place warnings at the crossing in addition to the visual warning that already existed at the time of the accident.

## II. PLAINTIFFS' MOTION TO RECONSIDER (DE 286).

The Plaintiffs also move to reconsider the Court's ruling on summary judgment. Specifically, the Plaintiffs ask the Court to reconsider its determination that there is insufficient evidence from which a jury could conclude that Norfolk Southern's engineer could have saved Deputy Dugle from injury after discovering his peril.

As stated in *Maggard v. Louisville & N.R. Co.*, 568 S.W.2d 508 (Ky. App. 1977), at a private crossing, the "only duty of a railroad is to exercise ordinary care to save a person from injury after his peril is discovered by those in charge of the train." *Id*. at 509. Likewise, the person crossing the track "must exercise ordinary care for his own safety."*Id*.

In their response to Norfolk's motion for summary judgment, the Plaintiffs argued that Norfolk's crew had an opportunity to avoid the collision, "had they kept a vigilant lookout, and had they taken proper emergency actions upon visualizing [Deputy Dugle's] vehicle shortly before the collision." (DE 210 at 17).

As noted by the Court in its prior ruling, in determining whether the railroad breached its duty to a motorist in peril, the issue is not when the train crew *should* have discovered the peril but when it actually discovered the peril. *Louisville & N.R. Co. v. Wallace*, 302 S.W.2d 561, 564 (Ky. 1957)(no duty of lookout is imposed on a private crossing "but if a person's peril is discovered in time to prevent injury to him, the trainmen, even in such cases, are charged with the exercise of ordinary care to use all means at their command to avoid injuring that person."). The Court determined that there was no evidence in the record that the train crew could have done anything to avoid the collision after they first spotted Deputy Dugle's cruiser.

On reconsideration, the Plaintiffs argue that there is conflicting evidence about when the train engineer actually first saw Deputy Dugle's cruiser. They argue that there is evidence that the engineer

9

was keeping a vigilant lookout and that, if so, he should have first seen the bumper of Deputy Dugle's cruiser some time between 3.5 and 4.2 seconds before the collision. The Plaintiffs argue that Norfolk's experts have presented evidence that this was sufficient time for the engineer to sound the horn and for Deputy Dugle to avoid the collision.

The Court will assume that a jury could infer from this evidence that, despite the train engineer's testimony, he actually saw the front bumper of Deputy Dugle's cruiser as much as 4.2 seconds before the collision. The problem is that what matters for the motorist-in-peril analysis is not when the train engineer saw the front bumper of the cruiser, but when he saw Deputy Dugle actually "in peril." And Deputy Dugle could not possibly be said to be "in peril" until at least the moment when his front bumper crossed the north rail of the crossing.

In *Calhoun*, the court found that the train engineer was not required to sound the horn "merely because [the driver] was observed heading toward the crossing but not at the time in peril." *Calhoun*, 2009 WL 152970 at *10. Instead, the driver would have been in peril when she "started over the tracks," and it was at that point that the train should have sounded the horn. *Id*. In *Whalen*, another recent decision by the Kentucky Court of Appeals, the court rejected an expert's opinion that the train engineer was required to apply the brakes "upon seeing [the driver's] vehicle approaching the crossing." 2010 WL 1404409 (Ky. App. 2010). Instead, the duty to exercise ordinary care arose "after peril was discovered." *Id*. at *3. And the driver was not "in peril until he failed to abide by his own statutory duty to stop and yield the right of way." *Id*. Likewise, the Kentucky Supreme Court has held that the question on the motorist-in-peril case is "not whether the crewmen saw [decedent] in time to stop before striking him but whether they saw his *peril* in time." *Louisville & Nashville Railroad Co. v. Vanderpool*, 496 S.W.2d 349, 351 (Ky. 1973). In that case, the court

determined that the decedent was not yet in peril even while he was *sitting* on the tracks. "He was not in peril unless he could not remove himself from the tracks." *Id*.

Until a motorist is actually "in peril" as, for example, by starting over the tracks, "the operators of the train have the right to believe that the one who is only potentially approaching danger will desist from his course and avert it before actual peril is created, and which desisting, ordinary prudence on his part requires and demands." *Chesapeake & O.R. Co. v. Harrell's Adm'r*, 113 S.W.2d 23, 28 (Ky. App. 1937)(quoting *Cincinnati, N.O. & T.P. Ry. Co. v. Wallace's Adm'r*, 103 S.W.2d 91, 94 (Ky. 1937)).

Assuming that Deputy Dugle was actually "in peril" when his front bumper reached the north rail, the Plaintiffs have not argued that, had the train sounded the horn at that time, the accident could have been avoided. In their reply brief on reconsideration and at oral argument, the Plaintiffs indicate that Defendant's expert Raymond Brach "suggested" in an attachment to the errata sheet for his deposition that Deputy Dugle could have avoided the collision as late as 1.4 seconds before impact – when Deputy Dugle was already on the track – if he had rapidly accelerated his vehicle. (DE 416, Reply at 5). At oral argument, the Plaintiffs indicated that the errata sheet suggests that the collision could have been avoided as late as 1.2 second before impact.

However, if there is anything all parties to this case know, this means nothing without considering the perception-reaction times of Deputy Dugle and the train crew. The Plaintiffs point to no evidence in the record that, considering the relevant perception-reaction times, Deputy Dugle could have cleared the track in time to avoid the accident had the train crew sounded the horn after discovering his peril.

For all these reasons, the Plaintiffs' Motion for Reconsideration will be denied.

### III. CONCLUSION.

For all these reasons, the Court hereby ORDERS the following:

1) the Motion for Reconsideration by the Defendant Norfolk Southern Railway Company ("Norfolk")(DE 294) is GRANTED;

2) the Court hereby AMENDS its summary judgment ruling to find that crossing at issue was not ultrahazardous and that Norfolk did not breach the duties owed by it to Paul Dugle at this private crossing; and

3) the Motion for Reconsideration filed by the Plaintiffs (DE 336) regarding Motorist in Peril is DENIED.

Signed By:
Karen K. Caldwell
United States District Judge